UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE KNIGHT,<br><br>    Plaintiff,<br>v.<br><br>MOTIVE ENERGY TELECOMMUNICATIONS GROUP, INC.,<br><br>    Defendant. | Case No.: 5:23-cv-1511-CBM-SPx<br><br>**ORDER RE: MOTIVE ENERGY TELECOMMUNICATIONS GROUP, INC.'S MOTION TO COMPEL ARBITRATION** |

The matter before the Court is Defendant Motive Energy Telecommunications Group, Inc. ("Motive")'s Motion to Compel Arbitration. (Dkt. No. 39 ("Motion").)

## I. BACKGROUND

This is a collective action under the Fair Labor Standards Act ("FLSA") filed by Plaintiff Jesse Knight[1] on August 1, 2023, for unpaid overtime wages. (Dkt. No. 1 ("Compl.").) Plaintiff was a non-exempt field worker in Colorado for Motive, a telecommunications company. (Compl., ¶ 8, 10.) Plaintiff alleges that in the three years before filing suit, Motive failed to pay him and "similarly situated field

---

[1] Another individual, Anthony Montanez, is an opt-in Plaintiff to this collective action. (*See* Dkt. No. 4-2 (Consent to Join – Anthony Montanez).)

1

workers" overtime compensation at "time and a half" of his regular pay, as required under the FLSA. (*Id.*, ¶¶ 28-29.)

On October 12, 2023, Motive filed an Answer to the Complaint. (Dkt. No. 20.) On February 19, 2024, the parties filed a joint Rule 26(f) report, and on February 22, 2024, the Court set dates for discovery deadlines, settlement conference, pretrial conference, and trial. (Dkt. Nos. 29, 30.) On May 15, 2024, Motive filed a Motion to Compel Arbitration, arguing that Motive recently discovered that Plaintiff entered into a valid and enforceable written arbitration agreement (the "Agreement") at the beginning of his employment with Motive, and that the Agreement applies to Plaintiff's claims in this action. On June 18, 2024, Plaintiff filed an opposition to the Motion. (Dkt. No. 52 ("Opp.").) On June 25, 2024, Motive filed its reply. (Dkt. No. 55 "Reply").) The parties also filed declarations in support of their respective positions. (Dkt. Nos. 40, 41, 52-1, 52-2, 56, 57-1, 72.)

## II. STATEMENT OF THE LAW

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate involving interstate commerce is "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001). A party aggrieved by the refusal of another to arbitrate under a written arbitration agreement may petition a United States district court for an order directing that such arbitration proceed in the manner provided for in the agreement. 9 U.S.C. § 4. The FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The Court's role under the FAA is therefore limited to determining: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id*. Additionally, "any doubts concerning the scope of arbitrable issues

should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (footnote omitted).

### III.    DISCUSSION

**A.    Valid and Enforceable Agreement**

The parties dispute whether a valid arbitration agreement exists. "In determining the validity of an agreement to arbitrate, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (cleaned up). "Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply." *Id.* "[W]here, as here, a federal court's jurisdiction is not based on diversity of citizenship, federal common law choice-of-law rules apply." *Charles v. Portfolio Recovery Assocs., LLC*, 2024 WL 1672350, at *1 (9th Cir. Apr. 18, 2024) (citing *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)). "Federal common law follows the Restatement (Second) of Conflict of Laws, under which [state] law, as the parties' choice of law, governs the validity of the arbitration clause." *Id.*

Here, the Agreement includes a general choice-of-law provision:

> Governing Law. The validity, interpretation, effect, and enforcement of this Agreement shall be governed by the laws of the State of Colorado without reference to choose of law principles.

(Dkt. No. 41-1 at 4.) The arbitration provisions within the Agreement also include a choice-of-law clause, as follows:

> The Company and Employee hereby mutually agree that any dispute or controversy between the parties arising from or in any way related to Employee's employment with the Company, shall be submitted to and determined by binding arbitration under the Colorado Arbitration Act (hereinafter "Arbitration Agreement"). The Company and Employee agree, however, that an exception to the Arbitration Agreement exists for purposes of the Company seeking an injunction from any court of

> competent jurisdiction to enforce this Agreement pursuant to Section 7 of this Agreement ("Enforcement of Agreements").

(Dkt. No. 41-1 at 5.)

Therefore, Colorado law applies in determining the validity of the Agreement. Under Colorado law, "[t]he court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." C.R.S. § 13-22-206(2). Motive "has the burden of establishing that the matter is subject to arbitration." *Johnson-Linzy v. Conifer Care Communities A, LLC*, 2020 COA 88, ¶ 23.

The parties' only dispute regarding the validity of the Agreement is the authenticity of Plaintiff's signature on the Agreement itself. Motive argues Plaintiff Knight signed the Agreement on February 8, 2022 at 19:03 CST, "as part of Motive's routine onboarding process" and that the Agreement was "presented to Plaintiff alongside other pre-employment documents." (Mot. at 6.) Knight denies that he signed the Agreement and argues that the Agreement is not authentic because (1) the other documents he signed as part of his onboarding process with Motive were sent to him to be executed by DocuSign while his signature on the Agreement "does not appear to have been generated by DocuSign"; (2) his signature on the other documents "do not share the same format" as the one in the Agreement; (3) both the execution date stated in the Agreement (February 14, 2021) and the date of his purported signature to the Agreement (February 8, 2022) cast further doubt on the Agreement's authenticity; and (4) Wheeler did not start working for Motive until November 2023 (after Knight left Motive and after this action was filed), yet Wheeler's signature is on the Agreement.

"When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014) (analyzing motion to compel arbitration under

Colorado law).[2] "In ascertaining whether questions of material fact remain, we give the nonmoving party—here, Plaintiff[]—the benefit of all reasonable doubts and inferences that may arise." *Id.* (internal quotations omitted).

Here, Motive submitted a declaration from its VP of Human Resources stating Motive's practice regarding new employees and completion of standard paperwork, including signing an arbitration agreement. The declaration states that Knight signed the Agreement at 19:03 on February 8, 2022, and attaches a copy of the Agreement with his signature affixed. (Dkt. No. 41-1.) The declaration provides no further detail about the process by which an employee affixes their signature (such as whether the agreement is clickwrap, browser-wrap, or displayed in some other manner, or how Knight provided his assent to the Agreement).

In response, Knight submitted a declaration stating that he does not recall signing the Agreement, that he has no record of signing the Agreement in either his email or his DocuSign history, and that he signed other onboarding documents on January 28, 2022, not February 8, 2022. (Dkt. No. 52-2.)

Wheeler's second declaration explains that at the time Knight was hired, arbitration agreements were sent to new hires via ADP, while some other paperwork was sent via DocuSign. (Dkt. No. 56, ¶ 7.) The declaration provides further details about the process by which employees sign arbitration agreements—specifically, that employees have to agree to use ADP, that they are provided their own login ID, and that they create a unique password "that no one else can access or use." (*Id.*, ¶ 5.) The declaration also attaches "audit trails" pulled from ADP indicating that Motive sent Knight the Agreement on February 8, 2022 and Knight signed the Agreement the same day. (Dkt. Nos. 55-2, 55-3.) Finally, the declaration clarifies

---

[2] *See also J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 130 (Colo. 2007) (under the Colorado Uniform Arbitration Act, the court "must determine "whether material issues of fact are disputed and, if such factual disputes exist, it must conduct an expedited evidentiary hearing to resolve the dispute") (cleaned up).

that Wheeler signed "all arbitration agreements of past and current employees" upon her joining Motive as a matter of policy. (Dkt. No. 56, ¶ 13.)

Knight's second declaration states that he "did not have access to the ADP Portal prior to his first day of employment," that he searched his emails for any emails containing the term "ADP" and found "no emails from ADP or from Motive asking [him] to set up [his] ADP account and sign onboarding documents," that the audit trail exhibit submitted by Motive shows some documents he recalls handwriting his signature on hard copies as having been signed "electronically through the ADP Portal," and that he did not electronically sign any onboarding documents through the ADP Portal. (Dkt. No. 57-1, ¶¶ 9-11, 13.)

Finally, Wheeler's third declaration states that she reviewed the metadata associated with the Agreement and "can confirm that Plaintiff first registered his own user credentials . . . to enable him to access his ADP Portal on February 8, 2022," which coincides with the date and time that Plaintiff purportedly signed the Agreement. (Dkt. No. 72, ¶ 6.) Wheeler also states that the IP address used to access the ADP Portal on that date was from Hockley, Texas, which is "consistent with the address listed on Plaintiff's resume." (*Id.*, ¶ 7.)

The Court finds that Plaintiff has raised a genuine issue of material fact regarding the authenticity of his signature and validity of the Agreement. While "general denials and statements that a user does not recall visiting a website or agreeing to arbitrate are insufficient to defeat arbitration" or raise a genuine issue for trial, Plaintiff here offers more than "[his] lack of recall" (*Beattie v. TTEC Healthcare Sols., Inc.*, 2019 WL 2189481, at *2 (D. Colo. May 21, 2019) (cleaned up))—he attests that he has no DocuSign or email record of Motive sending him the Agreement, or email record of Motive or ADP requesting he set up an ADP account. In response to Wheeler's declaration explaining that Plaintiff signed the Agreement via the ADP Portal and not via DocuSign, Plaintiff attests that he did not have access to the ADP Portal prior to his first day of employment. (Dkt. No. 57-1, ¶ 9.)

Wheeler attests that the IP address used to register the user credentials associated with Plaintiff was from Hockley, Texas, which is the same town Plaintiff listed as his address on his resume. (Dkt. No. 72, ¶ 7.) There is no other evidence indicating how Motive knows it is *Plaintiff* who registered those user credentials. Moreover, Motive provides no details about the process by which Plaintiff assented to the Agreement via the ADP Portal, such as how the Agreement was displayed or presented to Plaintiff or what mechanism he used to signify his agreement and affix the electronic signature. Motive cites to no authority holding that such evidence is sufficient to authenticate Plaintiff's signature on the Agreement. Another district court has found that defendants failed to establish a valid arbitration agreement where the defendants similarly lacked sufficient evidence authenticating electronic signatures. *See Smith v. Rent-A-Ctr., Inc.*, 2019 WL 1294443, at *7 (E.D. Cal. Mar. 21, 2019).

Plaintiff also attests that he signed several documents in handwriting on hard copies, not "electronically" as indicated by the ADP audit trails attached to the second Wheeler declaration. (*Id.*, ¶ 11.) Motive did not explain this apparent inconsistency or provide any evidence refuting Plaintiff's statement in the third Wheeler declaration.[3] Courts have denied motions to compel arbitration where, in response to rebuttal evidence that no valid arbitration agreement exists, a defendant "offers no explanation for the contradictory … information" on an HR platform. *See Levine v. Vitamin Cottage Nat. Food Markets, Inc.*, 2021 WL 4439800, at *9 (D. Colo. Sept. 27, 2021).

Therefore, the Court finds that Motive has not met its burden to prove that a valid arbitration agreement exists.

---

[3] At the hearing on the Motion, the Court asked Motive how the Court can rely on the ADP audit trails as evidence when Plaintiff's second declaration has raised an issue regarding the accuracy of the audit trails. Motive responded only that the audit trails accurately reflect Plaintiff's signatures to the onboarding documents listed in the audit trails.

**B.     Waiver**

Plaintiff argues that even if there is a valid arbitration agreement, Motive has now waived its right to arbitrate Plaintiff's claims by litigating this action in federal court and delaying in bringing its Motion. (Dkt. No. 52 at 25.) "Parties may agree to state law rules for arbitration even if such rules are inconsistent with those set forth in the [FAA]." *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir.), *opinion amended on denial of reh'g*, 289 F.3d 615 (9th Cir. 2002). But the "strong default presumption is that the FAA, not state law, supplies the rules for arbitration." *Id*. "[A] general choice-of-law clause within an arbitration provision does not trump the presumption that the FAA supplies the rules for arbitration." *Id*. at 1270. In the Ninth Circuit, "an arbitration clause providing that controversies are to be resolved 'in accordance with the laws of the State of California and the rules of the American Arbitration Association,' does not evince clear intent to incorporate California arbitration rules. In contrast, a provision that requires arbitration to be 'conducted and subject to enforcement pursuant to the provisions of California Code of Civil Procedure 1280 through 1295' clearly exhibits an intent that the state law rules for arbitration shall govern." *Sonic Auto., Inc. v. Younis*, 2015 WL 12656915, at *3 (C.D. Cal. Oct. 19, 2015) (analyzing Ninth Circuit precedent in *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1312 (9th Cir. 2004) and *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1067 (9th Cir. 2010)) (cleaned up); *Shulman v. Kaplan*, 2020 WL 2748022, at *5 (C.D. Cal. Jan. 28, 2020) (stating same).

Here, the parties have agreed to Colorado state law (and the Colorado Uniform Arbitration Act) as the governing law for arbitration. The Colorado Supreme Court has devised a six-factor test "to determine whether parties have acted inconsistently with their contractual right to seek ADR"—(1) whether the party has actually participated in the lawsuit or has taken other action inconsistent with his rights; (2) whether litigation has substantially progressed by the time the intention to arbitrate was communicated by the party moving to dismiss; (3) whether

there has been a long delay seeking a stay and whether the defendant filed counterclaims without asking for a stay; (4) whether a request to compel arbitration was initiated close to trial; (5) whether the party seeking arbitration has taken unfair advantage of discovery proceedings which would not have been available in arbitration; and (6) whether the other party was affected, misled, or prejudiced by the delay. *City & Cnty. of Denver v. Dist. Ct.* ("*Denver*"), 939 P.2d 1353, 1369 (Colo. 1997).

In *Waldman v. Old Republic Nat. Title Ins. Co.*, 12 P.3d 835, 837 (Colo. App. 2000), a Colorado appellate court found that where a "defendant removed the action to federal court and, once in that forum, filed an answer to the complaint without asserting its right to arbitrate as an affirmative defense," had "additional opportunities to request arbitration but failed to do so," and had prejudiced plaintiffs because it caused plaintiffs "to expend time and money in the litigation process," the defendant had waived its right to arbitrate.

The Court finds that factors (1), (3), and (6) weigh in favor of finding waiver, while factors (2), (4), and (5) weigh against finding waiver. First, Motive has "actually participated in the lawsuit"—it filed an answer and a joint Rule 26(f) report, and according to Plaintiff, it has also engaged in some discovery. (Dkt. No. 52 at 30.) As in *Waldman*, Motive filed an answer to the complaint (as well as a joint Rule 26(f) report) without asserting a right to arbitration as an affirmative defense. Motive contends that it did not provide the Agreement "upon initial review of [Plaintiff's] employee file due to a lack of understanding as to the legal requirements at that time" (Dkt. No. 41, ¶ 8), but that statement indicates that *Motive* knew of the existence of the Agreement well before it filed its Motion, even if Motive's counsel only learned of the Agreement later.[4] Second, Motive has yet to

---

[4] At the hearing on the Motion, Motive did not address when the company learned of the Agreement—only that counsel learned of the Agreement in February 2024. But as Plaintiff notes, Motive likely knew the Agreement existed at least as far back

9

file any dispositive motions or raise any arguments on the merits of Plaintiff's claims. Although this action has been pending since August 2023, litigation has not yet substantially progressed, as the parties have only exchanged some informal discovery. Third, Motive has not filed counterclaims, but it delayed seeking to compel arbitration for several months. Fourth, Motive's Motion was not made close to trial. Fifth, since the parties are not far into discovery, it is unlikely that Motive has taken advantage of discovery proceedings that would not be available in arbitration. Sixth, because Motive failed to raise the existence of the Agreement in either its Answer or the joint Rule 26(f) report, its delay has likely misled Plaintiff, as he had no reason to believe his claims would not proceed in federal court until Motive informed him of its intent to file this Motion.[5]

On balance, the Court finds that even if a valid arbitration agreement existed, Motive's actions in this litigation have waived its right to arbitrate Plaintiff's claims.[6] Because Motive has waived its right to arbitrate Plaintiff's claims, the Court finds that denial of the Motion, rather than a jury trial or evidentiary hearing regarding the existence of a valid arbitration agreement, is appropriate.

## IV. CONCLUSION

Accordingly, the Court **DENIES** the Motion to Compel Arbitration. The Court hereby sets the following case schedule deadlines:

- ADR-1 Form shall be filed no later than September 5, 2024.

---

as October 2023 (the date of Motive's Answer), and likely as early as August 2023 (the date of the Complaint) or even May 2023 (the date of Plaintiff's demand letter)—and delayed raising it with Plaintiff and with the Court until recently.

[5] Following *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), prejudice is no longer a *requirement* to finding waiver of arbitration. However, the Court has considered it here as part of the sixth factor within the test laid out in *Denver*.

[6] Moreover, at the hearing on the Motion, the parties agreed that Motive has not moved to compel arbitration of opt-in Plaintiff Montanez's claims. Therefore, even if Knight's claims were compelled to arbitration, there would still be live claims remaining in this action, and a stay or dismissal would not be appropriate.

- Fact discovery shall be completed on or before March 4, 2025.
- Initial expert disclosures shall be due no later than April 4, 2025.
- Settlement conference shall be held on or before April 7, 2025.
- Rebuttal expert disclosures shall be due no later than May 7, 2025.
- Expert discovery shall be completed on or before May 21, 2025.
- Last day to hear dispositive motions is July 24, 2025.
- Pre-trial conference is set for August 21, 2025.
- Jury trial is set for September 18, 2025 (est. 6-8 days).

**IT IS SO ORDERED.**

DATED: August 27, 2024

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE